**SO ORDERED.**

**SIGNED this 7 day of August, 2025.**



                                                   **Joseph N. Callaway**
                                                   **United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NEW BERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JSMITH CIVIL, LLC, | ) | |
| | ) | Case No. 23-02734-5-JNC |
| Debtor. | ) | Chapter 11 |
| _____ | ) | |
| | ) | |
| JSMITH CIVIL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 24-00004-5-JNC |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION ON ORDER GRANTING SUMMARY JUDGMENT**

The matter before the court is the motion for summary judgment and incorporated memorandum of law, along with attached exhibits, (AP Dkt. 36, the "Motion") of defendant United States of America ("Defendant" or "United States"). Plaintiff JSmith Civil, LLC ("JSmith" or "Plaintiff") responded in opposition (AP Dkt. 43, the "Response") also with supporting exhibits (AP Dkt. 44). The United States filed a reply brief (AP Dkt. 45, the "Reply").

## PROCEDURAL HISTORY

JSmith is a chapter 11 debtor before this bankruptcy court, having filed its voluntary petition (BK Dkt. 1) on September 19, 2023. In due course, its chapter 11 plan of reorganization was approved by order dated September 19, 2024 (BK Dkt. 426). Among other things, the confirmed plan permitted JSmith to pursue available litigation post-confirmation. JSmith's chapter 11 case remains open and active with this bankruptcy court as this matter proceeds.

In this adversary proceeding, JSmith seeks turnover and recovery of tax refunds or refundable credits it contends arise as a result of the Employee Retention Credit ("ERC"), a COVID-relief credit, totaling more than $1 million. JSmith filed an amended complaint on April 4, 2024 (AP Dkt. 7, the "Amended Complaint"). In it, JSmith contends its construction company operations were fully or partially suspended by and due to the effect of government orders from April through June of 2020 ("Q2 2020") and again in April through June of 2021 ("Q2 2021"). (Interrogatory Responses, AP Dkt 36-5 at 36.) JSmith seeks to recover alleged resulting tax credits and monetary recovery totaling $350,478.53 for Q2 2020 (Form 941-X for Q2 2020, AP Dkt. 7-9) and $745,394.93 for Q2 2021 (Form 941-X for Q2 2021, AP Dkt. 7-10).[1]

In the Motion, the United States maintains that because an ERC is only available to businesses whose activities were suspended or partially suspended by a qualifying governmental order, and because the relevant North Carolina shutdown order exempted construction companies, JSmith is ineligible for this credit as a matter of law.[2] In contrast, JSmith contends that crucial

---

[1] The United States contends even if Plaintiff could prove it qualified as an eligible employer for the disputed quarters, JSmith would still bear the burden of substantiating the credit amount.

[2] In the Response, JSmith seeks alternative relief in the form of summary judgment for it as the non-moving party pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. Given the result here, the court need not address whether there was adequate notice and opportunity for response as required by Rule 56(f).

aspects of its construction business and operations were suspended during the two quarters at issue[3] as a result of orders issued from various governmental authorities, including orders of Roy A. Cooper, III, in his capacity as Governor of the State of North Carolina, and other COVID era related orders issued by various state and federal governmental agencies.

## JURISDICTION

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151 and 1334 and is authorized to hear this case under the General Order of Reference entered August 3, 1984, by the United States District Court for the Eastern District of North Carolina. The primary matters raised in the adversary proceeding make it a core proceeding pursuant to 28 U.S.C. § 157(b), and the court has statutory authority to enter a final judgment as to those matters. In addition, the parties consented to this court entering final judgment on all matters raised in the adversary proceeding. *See* Pretrial Scheduling Order of May 21, 2024 (AP Dkt. 12). The court consequently has full constitutional authority to enter final judgment in this adversary proceeding. *Wellness Int'l Network, Ltd., v Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1947 (2015).

## DISCUSSION

I.  **Summary Judgment Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure is made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy. Summary judgment "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322,

---

[3] JSmith applied for, and received refunds and overpayments based upon employee retention credits for the calendar quarters ending March 31, 2020 ("Q12020"), September 30, 2020 ("Q3 2020"), December 31, 2020 ("Q4 2020"), and March 31, 2021 ("Q1 2021") (collectively, the "Allowed ERTC Refunds"). (Amended Complaint ¶ 50.) Those quarters are not at issue in this adversary proceeding.

106 S. Ct. 2548, 2552 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Id.* at 325. Summary judgment is only appropriate when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, (1986). In evaluating a summary judgment motion, a court "must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant . . . ." *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

If the moving party meets its initial burden, the non-moving party may not rest on the contents of its pleading. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. The non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, summary judgment is not a vehicle for the court to resolve disputed factual issues. *Faircloth v. United States*, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

In making its determination, inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The court should examine "both the materiality and the genuineness of the alleged fact issues" in its ruling. *Faircloth*, 837 F. Supp. at 125.

4

## II. CARES ACT and the ERC

In 2020, Congress passed the first CARES Act for the purpose of providing financial assistance to Americans suffering economic harm due to the COVID-19 pandemic and mandated public social and business-related shutdowns. *See* CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). The Act created several forms of assistance as part of Congress's efforts to stabilize the economy, including individual Economic Impact Payments, *id.* § 2201, the Paycheck Protection Program, *id.* § 1102, and, relevant here, the Employee Retention Credit ("ERC"), *id.* § 2301.

Some of the programs provided relief to (nearly) everyone. For instance, the Economic Impact Payment ("EIP") for 2020, codified at 26 U.S.C. § 6428, defines "eligible individual" as "any individual other than (1) any nonresident alien individual, (2) any individual with respect to whom a deduction under section 151 is allowable to another taxpayer . . . and (3) an estate or trust." 26 U.S.C. § 6428(d). Congress writes such "presumption-in" statutes when it intends to provide widespread relief. In other words, under the EIP statute, every individual is "in," unless one of the three exceptions knocks them "out." *Cf. Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1034–35 (N.D. Cal. 2020) (examining whether the statutory text *excluded* incarcerated individuals).

In contrast, the ERC contains more traditional and onerous eligibility criteria. It is a "presumption-out" statute, where everyone starts outside of eligibility for the stated relief, and claimants must show why they fit within and satisfy applicable statutory definitions to get "in" and qualify for the relief. Particularly relevant here is Plaintiff's claim that it is an "eligible employer," which term is defined in the ERC as follows:

> Sec. 2301. Employee retention credit for employers subject to closure due to COVID–19.
>
> (2) ELIGIBLE EMPLOYER.—

> (A) IN GENERAL.—The term ''eligible employer'' means any employer— (i) which was carrying on a trade or business during calendar year 2020, and (ii) with respect to any calendar quarter, for which— **(I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019** (COVID–19), or (II) such calendar quarter is within the period described in subparagraph (B).

26 U.S.C. §2301(c)(2)(A) (emphasis added) (hereinafter referred to as "Section 2301").[4]

The central question before the court on summary judgment, therefore, is whether JSmith's operations were fully or partially suspended, as that term is used in Section 2301, during Q2 2020 and Q2 2021 due to one or more qualifying governmental orders. The CARES Act and its amendments do not define the key terms "partial," "suspension," or "orders from an appropriate governmental authority," and no other reported federal case law define these terms within the meaning of Section 2301.

To fill this dearth, the IRS has published several documents containing its subregulatory guidance on interpreting these and other key terms from the applicable COVID-era statutes. (*See, e.g.*, AP Dkt 36 Ex. 7 (Notice 2021-20) and Ex. 8 (OSHA GLAM).) However, in the present era, federal courts should no longer give deference to agency interpretations of statutory language; rather, a court must "exercise independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 601 S. Ct. 2244, 2262 (2024).[5] Courts may still consider the guidance given by examining the "thoroughness evident in its consideration, the validity of its reasoning, its

---

[4] The Eligible Employer definition was not altered substantively in 2021. *See* AP Dkt. 36, Exs. 1 and 2. Further, the laws applicable to Q2 2020 and Q2 2021 have not been codified. *See* AP Dkt. 23-1 at 2 n.1. The present codified statute—26 U.S.C. § 3134—applies only to Q3 2021, which is not at issue here.

[5] *Loper* abruptly overturned forty years of precedent generated from *Chevron U.S.A. Inc. v. Natural Resources Defense Council* 467 U.S. 837 (1984) and the resulting doctrine known as the "*Chevron* deference." For a comprehensive review and empirical study of the short-term effect of *Loper*, *see* Robin Kundis Criag, *The Impact of Loper Bright v. Raimondo: An Empirical Review of the First Six Months*, 109 MINN. L. REV. 2671 (2025).

consistency with earlier and later pronouncements, and all those factors which give it power to persuade. . . ." *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also id.* at 394 ("[C]ourts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes.").

Where, as here, Congress does not expressly define a term, courts generally "construe a statutory term in accordance with its ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 114 S. Ct. 996, 1001 (1994). Fundamental rules of statutory construction dictate that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227, 134 S. Ct. 870, 876 (2014); (quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311 (1979)). A clear, unambiguous term, common of understanding in everyday use, will provide a "univocal interpretation" of the statute. *See Phillip Morris USA, Inc. v N.C. Dept. Rev.*, 386 N.C. 748, 749, 909 S.E.2d 197, 200 (2024). "If words at the time of their use had a well-known legal or technical meaning, they are to be so construed unless the [document at issue] itself discloses that another meaning was intended." *Wachovia Bank & Tr. Co. v. Waddell*, 237 N.C. 342, 346, 75 S.E.2d 151 (1953).

**III. Analysis**

### A. Contentions

As previously noted, the terms "fully or partially suspended" and "orders from an appropriate governmental authority" are not defined in Section 2301 or the CARES Act as a whole. The United States contends JSmith has not, and cannot, point to an order "from an appropriate governmental authority limiting commerce, travel, or group meetings" pertaining to its particular business as required by the statute.  JSmith points to North Carolina Executive Orders, the Occupational Safety and Health Administration ("OSHA") Enforcement Plan, Center for Disease

7

Control guidelines, and documents from other federal and state agencies. It will be assumed for purposes of this order that JSmith did shut down some aspects of its business. The IRS admits there is a genuine dispute of fact as to whether JSmith experienced a partial suspension of business during the relevant quarters but argues that fact is not material to the outcome of this case under the rules of statutory and order construction.

Looking at the wording and terms contained in Section 2301, Black's Law Dictionary defines "suspension" as "[t]he act of temporarily delaying, interrupting, or terminating something," or "[t]he state of such delay, interruption, or termination." *Suspension*, Black's Law Dictionary (12th ed. 2024). The plain meaning of "full" is complete or total, so a "full suspension" denotes a temporary but complete and entire stoppage of operations. A "partial suspension," then, is a temporary stoppage of a portion of operations. *Cf. Partial*, Black's Law Dictionary (12th ed. 2024) ("Not complete; of, relating to, or involving only a part rather than the whole.") The IRS interprets "partial suspension" to require a suspension of "more than a nominal portion of . . . business operations." (IRS Guidance, AP Dkt. 36-9 at 27.)

### B. Qualifying Governmental Orders

A qualifying suspension must be "due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." Section 2301(c)(2)(A)(ii)(I). An "order" is a "command, direction, or instruction." *Order*, Black's Law Dictionary (12th ed. 2024). An "order" should be understood in contrast to a "recommendation," which Black's Law Dictionary defines as 1. "A specific piece of advice about what to do, esp. when given officially" and 2. "A suggestion that someone should choose a particular thing or person that one thinks particularly good or meritorious." *Recommendation*, Black's Law Dictionary (12th ed. 2024). The

8

key distinction is that "an 'order' must be compulsory." *Lawrence Gen. Hosp. v. Continental Cas. Co.*, 90 F.4th 593, 604 (1st Cir. 2024) (discussing "order" as used in an insurance contract). Thus, to qualify as an "order," a directive must impose "binding requirements or repercussions for noncompliance." *Baxter Senior Living, LLC v. Zurich Am. Ins.*, 2025 WL 1207151, at *6 (D. Alaska Apr. 25, 2025). The IRS likewise interprets "order" to exclude "recommendations, guidelines, and suggestions." (IRS GLAM dated 11.3.23, AP Dkt 36-10.)

In the present context, the qualifying order must limit commerce, travel, or group meetings; must have issued from a governmental entity, and the impetus of the order must have been the COVID pandemic. Finally, the suspension must be "due to," in other words, because of the order. In sum, an ERC claimant must establish the following to qualify as an eligible employer: (1) it was subject to a compulsory governmental mandate limiting commerce, travel, or group meetings that was issued because of the pandemic; (2) it stopped a meaningful portion of its operations during the relevant quarter; and (3) the reason it stopped operating was that the governmental mandate directly required it.

### 1. North Carolina Executive Order 121

The North Carolina Governor issued an executive order on March 27, 2020, Executive Order 121, requiring all non-essential businesses to close (AP Dkt. 36-8, "Executive Order 121"). Executive Order 121 specifically exempted essential infrastructure operations, including construction, as provided and defined below:

> 5. **Essential Infrastructure Operations.** Essential Infrastructure Operations includes, but is not limited to: food and beverage production, distribution, fulfillment centers, storage facilities; **construction** (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long term care facilities, public works construction, school construction, and essential commercial and housing construction); building and grounds management and maintenance including landscaping; airport operations; operation and maintenance of utilities, including water, sewer, and gas;

9

> electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; polls; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video and telecommunications systems (including the provision of essential global, national and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Executive Order 121 (emphasis added).

The IRS concedes Executive Order 121 is an "order from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." (Section 2301.) "Construction" was categorically exempt from Executive Order 121, and there is no genuine dispute that JSmith continued with construction work during the relevant quarters. Nevertheless, JSmith contends, and Mr. Smith testified in his deposition, that the JSmith team reviewed Executive Order 121 and determined that it only exempted "critical infrastructure" construction work. ("J. Smith Dep.," AP Dkt. 44, Ex. B at 35.) JSmith contends its Commercial Site Work Division (approximately 1/3 of total business operations) was not an "essential business" under Section 2 of Executive Order 121, and all nonessential business activities were required to cease on March 27, 2020. However, this position was undercut in the deposition testimony of JSmith's Chief Financial Officer Kevin Armory, where he testified, "JSmith was an essential business. Did not have to stop work." (AP Dkt. 44, Ex. C ("Armory Dep.") at 31.) Mr. Armory further testified, "[The employees] still got to go to work. We're essential." (Armory Dep. at 41). Crucially, in response to the question, "did JSmith ever completely cease operations?" he responded, "As an essential business, we had the ability to keep going." (Armory Dep. at 45.)

The government argues that even if JSmith did suspend a portion of its operations the court need not resolve this self-created factual dispute of the plaintiff, because whether the company was

10

*required* to do so by Executive Order 121 is a question of law, properly resolved on a motion for summary judgment. *Cf. United States v. Hassanzadeh*, 271 F.3d 574, 579–80 (4th Cir. 2001) (reviewing district court's interpretation of an Executive Order de novo and applying traditional tools of statutory construction).[6]

On its face, Executive Order 121 exempts "Essential Infrastructure Operations." (Executive Order 121.) While JSmith's alleged interpretation that this means "critical infrastructure" would be plausible if the term were not defined in Executive Order 121, "Essential Infrastructure Operations" is specifically defined to include "construction." *Id.* The word "construction" is followed by a parenthetical listing specific types of work that are included. *Id.* But it is clear the list is illustrative, not exhaustive, because it begins "including, *but not limited to*." *Id.* (emphasis added). Further, Executive Order 121 indicates that the term "Essential Infrastructure Operations shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined." *Id.* at 6. In his deposition, Jeremy Smith concedes all JSmith's functions qualify as construction, broadly defined: "we're in three different markets, so commercial site work construction; heavy highway construction; and utility construction. . . They are all forms of construction." (J. Smith Dep. at 49.)

As a matter of statutory construction from the exact wording of Section 2301, and by way of admission, as a matter of law Executive Order 121 did not require suspension of Plaintiff's operations as a construction company. The entire category of construction work was specifically

---

[6] Mr. Smith further testified that the company suspended approximately one-third of its operations for at least Q2 2020 (J. Smith Dep. at 35-36, 40, 53.) This assertion is contradicted by other record evidence showing that the company continued to grow, took on new projects, increased gross receipts, and hired new employees (Interrogatory Responses, AP Dkt. 36-5 at 52, 61). While this may constitute a dispute of fact, it is not material or decisive because any such suspension was not caused by a qualifying governmental order.

exempted. A request for a self-serving expanded definition of other terms cannot overcome the clear language exemption for the category. Therefore, JSmith cannot rely on Executive Order 121 as a governmental order to justify its suspension of operations under Section 2301.

### 2. Other Executive Orders

JSmith's memorandum in opposition to the Motion lists a host of other North Carolina Executive Orders entered by the Governor of North Carolina. Additionally, JSmith attached NC Executive Order 141 to the Amended Complaint. However, JSmith has failed to show any evidence regarding how these orders required JSmith to suspend its operations. In fact, many of these Executive Orders simply modified Executive Order 121 by loosening restrictions. The argument that these Executive Orders suspended JSmith's operations fails.

### 3. CDC, OSHA, USDOL, and NCDOL

Aside from the Executive Orders, JSmith also seeks to rely on documents from other state and federal governmental agencies and authorities—including the Center for Disease Control ("CDC"), the Occupational Safety and Health Administration ("OSHA"), the United States Department of Labor (the "USDOL"), and the North Carolina Department of Labor (the "NCDOL"). JSmith contends these agencies issued orders that imposed certain obligations, restrictions, and affirmative actions upon the business operations and affairs of North Carolina employers, including JSmith. In particular, it points to Section 5(a)(1) of Occupational Safety and Health Act of 1970, codified at 29 U.S.C. § 654(a)(1), known as the "General Duty Clause," which requires employers to furnish to each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1). JSmith then cites guidance issued by both OSHA and the CDC as follows,

12

arguing this guidance was incorporated into and enforced as an order by OSHA through the General Duty Clause.

On March 9, 2020, OSHA issued Guidance for Preparing Workplaces for COVID-19, which outlined measures that all employers should take to reduce the risk of workplace exposure of their employees to the virus that causes COVID-19. (Amended Complaint ¶ 19.) In furtherance thereof, and on April 13, 2020, May 19, 2020, and March 12, 2021, OSHA issued the following guidance and procedures for minimizing and mitigating workplace risks to employees and employers posed by COVID-19 throughout the United States:

A. Interim Enforcement Response Plan for Coronavirus Disease 2019 (COVID-19) on April 13, 2020 (the "OHSA Enforcement Plan"); and

B. Updated Interim Enforcement Response Plan for Coronavirus Disease 2019 (COVID-19) (the "Updated OSHA Enforcement Plan")

(collectively, the "OSHA Enforcement Plan" or the "OSHA Enforcement Procedures", Amended Complaint, Exs. 3 and 4). JSmith contends the OSHA Enforcement Plan was subsequently adopted by the North Carolina Department of Labor by a memo dated May 26, 2020. (Amended Complaint, Ex. 5, the "NCDOL Memo.")

The United States disputes that any CDC guidance was incorporated into any enforceable regulations by OSHA and notes that it was all merely guidance. Further, they contend that the CDC guidance only constitutes recommendations and that the OSHA Enforcement Plan is itself only guidance, not a binding regulation. However, the court finds it need not resolve this potential dispute, as even if JSmith could show CDC guidance was property incorporated into some enforceable OSHA regulations, there has been no showing that any of the CDC guidance or OSHA regulations fully or partially suspended the operations of JSmith as required by Section 2301. While JSmith indicates that it was required to quarantine one of its crews upon the confirmed

13

exposure of one crew member, this temporary quarantine of one crew or enhanced cleaning and other COVID protocols does not rise to the level of a partial suspension of business operations as contemplated by Section 2301.

JSmith also argues it received a complaint from NCDOL for violating CDC guidelines and the OSHA Enforcement Plan, based upon an alleged failure to implement policies and procedures that ensure a safe work environment for its employees and reduce their potential exposure to Covid -19. (AP Dkt. 44-2, Ex. 4., the "NCDOL Complaint.") However, a review of the NCDOL Complaint reveals it was based on lack of proper protocols, not for operating a business that was not allowed to operate by a government order. Specifically, the NCDOL Complaint alleges that "[e]mployees were, or could have been, exposed to the COVID-19 virus in the workplace, due to, where cases are still occurring amongst members of the workforce and no protocols being in place to prevent the spread of the virus in the office." (NCDOL Complaint.) In fact, the NCDOL Complaint Letter shows that the business of JSmith was continuing during the pandemic and NCDOL does not indicate that business should have been suspended. Additionally, while it is unclear when the complaint was made to NCDOL, the NCDOL Complaint is dated November 9, 2022, well after either of the quarters at issue in this matter.

As a result, nothing from the guidance and plans issued by or from OSHA, the CDC, and the NCDOL, qualify as a governmental order under the ERC. JSmith is not entitled to rely upon any of these documents as a bedrock for qualification under section 2301.

### 4. General Disruption is Insufficient

Finally, JSmith points to work disruptions caused by sick employees, quarantined employees, and supply chain issues as evidence that its Q2 2020 and Q2 2021 construction business operations were partially suspended. While these situations are, for summary judgment

purposes, accepted as true and in fact disruptive to JSmith's work for the two calendar quarters at issue, they were not suspensions caused by a qualifying governmental order as required by Section 2301. In states where no shut down was ordered by the government, business suffered disruptions due to illness and quarantine amongst workers. Thus, while there is no doubt various delays, quarantines, sicknesses, and other disruptions occurred, general pandemic conditions caused those closures, not shut down orders. Under the ERC, however, only businesses whose operations were suspended due to a qualifying governmental order qualify for the credit.

## CONCLUSION

For the reasons shown above, Executive Order 121 is unambiguous in its exclusion of "construction" work, and Plaintiff JSmith does not contend it was in some other business for the quarters in question. JSmith has therefore failed to meet its burden in identifying a qualifying governmental order that resulted in the mandatory suspension, or partial suspension, of its construction business operations during Q2 2020 and Q2 2021. It has failed to demonstrate a genuine issue as to a material fact and cannot prove its case. Therefore, the United States, as the defendant, is entitled to summary judgment. A separate order granting summary judgment is entered concurrently.

**END OF DOCUMENT**