IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:25-CV-513

| | | |
|---|---|---|
| JSMITH CIVIL, LLC, Appellant, | ) | |
| v. | ) | **ORDER** |
| UNITED STATES OF AMERICA, Appellee. | ) | |

On August 22, 2025, JSmith Civil LLC ("JSmith" or "appellant") filed a notice of appeal from the United States Bankruptcy Court for the Eastern District of North Carolina ("the bankruptcy court") [D.E. 1]. JSmith appeals the bankruptcy court's order granting the United States' ("appellee" or "United States") motion for summary judgment. See id.; see also In re JSmith Civ., LLC, 674 B.R. 207 (Bankr. E.D.N.C. 2025). The dispute concerns over $1,000,000 in refundable credits under a COVID-19 relief program known as the Employee Retention Credit, which Congress enacted as part of the CARES Act. As explained below, the court affirms in part and vacates and remands for further proceedings.

I.

JSmith is a chapter 11 debtor in the United States Bankruptcy Court for the Eastern District of North Carolina. See In re JSmith Civ., LLC, 674 B.R. at 210. JSmith alleges that the United States owes JSmith refundable credits under the Employee Retention Credit ("ERC"), a COVID-19 relief program. See id. Specifically, JSmith alleges that the United States owes it $350,478.53 for Q2 2020 (April to June 2020) and $745,394.93 for Q2 2021 (April to June 2021). See id. at 211.

In 2020, Congress passed the CARES Act ("the Act") to help individuals and businesses affected by the COVID-19 pandemic. See CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). The Act created several forms of assistance including the ERC. See id. § 2301. The ERC provided "eligible employer[s]" with a tax credit against applicable employment taxes if the employer paid qualified wages to its employees during the calendar quarters in 2020 and 2021. Id. To qualify as an "eligible employer," an employer must have:

(i) carr[ied] on a trade or business during calendar year 2020, and

(ii) with respect to any calendar quarter, for which

> (I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19), [("suspension-by-order clause")]

Id. § 2301(c)(2)(A) (hereinafter "section 2301").[1] In other words, under section 2301's suspension-by-order clause, an employer must show that (1) the operation of the business was "fully or partially suspended" (2) "due to" (3) "orders from an appropriate governmental authority limiting commerce, travel, or group meetings." Id.

JSmith alleges that it was an eligible employer entitled to ERC benefits under section 2301's suspension-by-order clause. In the bankruptcy court, the United States moved for summary judgment on the "order" element, arguing that JSmith failed to cite a "qualifying order"—an "order[] from an appropriate governmental authority limiting commerce, travel, or group meetings." CARES Act § 2301(c)(2)(A)(ii)(I); In re JSmith Civ., LLC, 674 B.R. at 214; see

---

[1] The "eligible employer" definition was not altered substantively in 2021. See In re JSmith Civ., LLC, 674 B.R. at 213 n.4. The law applicable to 2020's Q2 and 2021's Q2 is not codified. See id. The codified statute (26 U.S.C. § 3134) applies only to 2021's Q3, which is not at issue in this appeal. See id. Thus, the court cites section 2301 of the CARES Act for the "eligible employer" definition.

[D.E. 7-3] 1, 12–18. In the bankruptcy court, the United States conceded that a genuine issue of material fact existed about "whether JSmith experienced a suspension of business during the relevant quarters[;]" therefore, the bankruptcy court "assumed for purposes of th[e] order that JSmith did shut down some aspects of its business." In re JSmith Civ., LLC, 674 B.R. at 214; see [D.E. 7-3] 10–12. Thus, the bankruptcy court decided only whether JSmith was subject to a qualifying government order under section 2301's suspension-by-order clause. See CARES Act § 2301(c)(2)(A)(ii)(I); In re JSmith Civ., LLC, 674 B.R. at 215 (observing that JSmith must prove that "it was subject to a compulsory governmental mandate limiting commerce, travel, or group meetings that was issued because of the pandemic").

The bankruptcy court initially determined the meaning of "order" in section 2301's suspension-by-order clause. The bankruptcy court compared the meaning of "order" and "recommendation" as defined in Black's Law Dictionary. See In re JSmith Civ., LLC, 674 B.R. at 214–15. Compare Order, Black's Law Dictionary (12th ed. 2024) (defining "order" as a "command, direction, or instruction"), with Recommendation, Black's Law Dictionary (12th ed. 2024) ("A suggestion that someone should choose a particular thing or person that one thinks particularly good or meritorious."). Based on that comparison, the bankruptcy court held that "order" means a "compulsory" directive that imposes "binding requirements or repercussions for noncompliance." In re JSmith Civ., LLC, 674 B.R. at 215 (citation omitted).

Next, the bankruptcy court analyzed whether JSmith was subject to a qualifying order under section 2301's suspension-by-order clause. In doing so, the bankruptcy court examined North Carolina Executive Order 121 ("EO 121"), "Other Executive Orders," and policies from other state and federal agencies such as the Center for Disease Control ("CDC"), the Occupational

Safety and Health Administration ("OSHA"), the United States Department of Labor ("USDOL"), and the North Carolina Department of Labor ("NCDOL"). See id. at 215–18.

As for EO 121, on March 27, 2020, the North Carolina Governor required all non-essential businesses to close. See North Carolina, Office of the Governor, Exec. Ord. No. 121 (Mar. 27, 2020) [hereinafter Exec. Ord. 121]. In the bankruptcy court, the United States and JSmith agreed that EO 121 is a qualifying order under section 2301's suspension-by-order clause. See In re JSmith Civ., LLC, 674 B.R. at 215. But the United States argued that JSmith, a construction company, was exempt from mandatory closure under EO 121. In support, the United States noted that EO 121 exempted from the closure order "Essential Infrastructure Operations," which "includes, but is not limited to:"

> [F]ood and beverage production, distribution, fulfillment centers, storage facilities; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long term care facilities, public works construction, school construction, and essential commercial and housing construction); building and grounds management and maintenance including landscaping; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video and telecommunications systems (including the provision of essential global, national and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Exec. Ord. 121 § 2(C)(5) (emphasis added).

In opposing summary judgment, JSmith argued that EO 121 only exempted "critical infrastructure" construction as demonstrated by the subsequent parenthetical in section 2(c)(5) of EO 121. JSmith then argued that it halted its Commercial Site Work Division because it believed it did not fit within the exempted "construction" definition in section 2(C)(5) of EO 121. See In re JSmith Civ., LLC, 674 B.R. at 216; Exec. Ord. 121 § 2(C)(5) (exempting "construction (including, but not limited to, construction required in response to this public health emergency,

hospital construction, construction of long term care facilities, public works construction, school construction, and essential commercial and housing construction")).

The bankruptcy court rejected JSmith's argument and held that EO 121 specifically defined "Essential Infrastructure Operations" to include "construction," and then "broadly defined" the term "construction." In re JSmith Civ., LLC, 674 B.R. at 216. The bankruptcy court explained that the "parenthetical listing specific types" of construction is "illustrative, not exhaustive." Id.; see Exec. Ord. 121 § 2(C)(5) (beginning the parenthetical with "including, but not limited to"). The bankruptcy court concluded that "[t]he entire category of construction work was specifically exempted[;]" therefore, JSmith was exempt from EO 121's closure directive. In re JSmith Civ., LLC, 674 B.R. at 216.

As for "Other Executive Orders," JSmith mentioned various other executive orders in its submission to the bankruptcy court but did not discuss those other executive orders in responding to the United States' motion for summary judgment. See [D.E. 7-3] 475–79, 489–95. The bankruptcy court held that these other executive orders were not qualifying orders because JSmith "failed to show any evidence regarding how these orders required JSmith to suspend its operations." In re JSmith Civ., LLC, 674 B.R. at 216–17.

As for certain policies of the CDC, OSHA, USDOL, and NCDOL, the United States argued that the policies were not orders under section 2301's suspension-by-order clause but merely recommendations from various governmental authorities. See [D.E. 7-3] 16–18. In opposing summary judgment, JSmith argued that NCDOL adopted and enforced CDC and OSHA guidelines through OSHA's General Duty Clause; therefore, the NCDOL incorporated the CDC's and OSHA's recommendations into enforceable orders. See id. at 492–94.

The bankruptcy court held that "nothing from the guidance and plans issued by or from OSHA, the CDC, and the NCDOL, qualify as a governmental order under" section 2301's suspension-by-order clause. In re JSmith Civ., LLC, 674 B.R. at 218. In reaching that conclusion, the bankruptcy court analyzed whether a "partial suspension of business operations" occurred. Id. at 217. That suspension issue involves a different element under section 2301's suspension-by-order clause. See id. The bankruptcy court also held that even if NCDOL enforced the CDC and OSHA guidelines through OSHA's General Duty Clause, such enforcement did not transform the guidelines from recommendations to an enforceable order fully or partially suspending the operation of JSmith's business. See id. at 217–18.

After concluding that JSmith was not subject to a qualifying order under section 2301's suspension-by-order clause, the bankruptcy court granted the United States' motion for summary judgment. See id. at 218; [D.E. 1-1] 1–2. On August 22, 2025, JSmith appealed. See [D.E. 1].

II.

This court has jurisdiction over this bankruptcy appeal under 28 U.S.C. § 158(a)(1). On appeal, a district court reviews a bankruptcy court's legal determinations de novo and its factual findings for clear error. See In re White, 487 F.3d 199, 204 (4th Cir. 2007); In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc., 453 F.3d 225, 231 (4th Cir. 2006); Schlossberg v. Barney, 380 F.3d 174, 178 (4th Cir. 2004). "[I]n reviewing a bankruptcy case on appeal, a district court can consider only that evidence which was presented before the bankruptcy court and made a part of the record." In re Bartlett, 92 B.R. 142, 143 (E.D.N.C. 1988) see Union Bank v. Blum, 460 F.2d 197, 202 (9th Cir. 1972); In re Moss, 266 B.R. 697, 702 (B.A.P. 8th Cir. 2001). The district court may "affirm, modify, or reverse" the bankruptcy court's "order, or remand with instructions for further proceedings." Gallagher v. Cohen, 659 B.R. 57, 62 (D. Md.

2024) (citation omitted); see Harman v. Levin, 772 F.2d 1150, 1153 n.3 (4th Cir. 1985); Fanning v. Burnett, 660 B.R. 207, 211 (E.D.N.C. 2024); R&J Contractor Servs., LLC v. Vancamp, 652 B.R. 237, 241 (D. Md. 2023).

Rule 56 of the Federal Rules of Civil Procedure applies to motions for summary judgment filed in bankruptcy proceedings. See Fed. R. Bankr. P. 7056. Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up). A court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation

or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

A.

Initially, the court addresses the meaning of "order" in section 2301(c)(2)(A). "[A]bsent an indication Congress intended [a term] to bear some different import," a court must give the term its "ordinary, contemporary, common meaning." In re Total Realty Mgmt., LLC, 706 F.3d 245, 251 (4th Cir. 2013) (citation omitted). If the term "is unambiguous," then a court's analysis must end with the statute's plain language. Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002); see In re Sunterra Corp., 361 F.3d 257, 265 (4th Cir. 2004).

"Order" means a compulsory command or directive and not merely a recommendation. Compare Order, Black's Law Dictionary (12th ed. 2024) (defining "order" as a "command, direction, or instruction), with Recommendation, Black's Law Dictionary (12th ed. 2024) ("A suggestion that someone should choose a particular thing or person that one thinks particularly good or meritorious."). See Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 604 (1st Cir. 2024) (explaining that an "order" must be "compulsory"). Thus, to qualify as an order under section 2301's suspension-by-order clause, a government directive must compel a certain course of conduct through binding requirements or repercussions for noncompliance. See, e.g., Lawrence Gen. Hosp., 90 F.4th at 605 (explaining that certain guidance issued during the COVID-19 pandemic were orders because the hospital's "'choice' to comply with the stated conditions or forgo the ability to treat 'the vast majority of its patients' for an indefinite period is no choice at all."); Ne. Health Servs., LLC v. United States, 181 Fed. Cl. 566, 577 (Fed. Cl. 2026) (holding that particular "guidance" qualified as an "order" under the suspension-by-order clause because "[t]o the extent businesses failed to comply with mandatory directives contained in that guidance, they

similarly risked civil penalties, criminal penalties, and loss of their clinic licenses."); Baxter Senior Living, LLC v. Zurich Am. Ins., No. 22-44, 2025 WL 1207151, at *6 (D. Alaska Apr. 25, 2025) (unpublished).

B.

EO 121 exempted "Essential Infrastructure Operations" from mandatory closure. See Exec. Ord. 121 § 2. EO 121 describes the term "Essential Infrastructure Operations" as "includ[ing], but . . . not limited to:"

> [F]ood and beverage production, distribution, fulfillment centers, storage facilities; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long term care facilities, public works construction, school construction, and essential commercial and housing construction); building and grounds management and maintenance including landscaping; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video and telecommunications systems (including the provision of essential global, national and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Id. § 2(C)(5) (emphasis added).

Statutory interpretation begins with the text. See Barnhart, 534 U.S. at 450; Othi v. Holder, 734 F.3d 259, 265 (4th Cir. 2013). To determine a text's plain meaning, this court looks not only to the text's language, but also to the context in which that language appears, and the broader context as a whole. See King v. Burwell, 576 U.S. 473, 486 (2015); Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc., 718 F.3d 249, 258 (4th Cir. 2013). Typically, the court gives undefined terms their "ordinary or natural" meanings. HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n, 594 U.S. 382, 388 (2021) (citation omitted). If a text is ambiguous, this court may examine other sources of meaning such as canons of construction or background legal

principles. See Bond v. United States, 572 U.S. 844, 859–60 (2014); Barnhart, 534 U.S. at 461–62.

Ordinarily, "construction" means "[t]he act of building by combining or arranging parts or elements." Construction, Black's Law Dictionary (12th ed. 2024); see Webster's II New Riverside University Dictionary 303 (2d ed. 1988) (defining "construction" as "[t]he act or process of constructing," with "constructing" being defined as "put[ting] together by assembling parts; build[ing]"); see, e.g., Am. States Ins. v. Edgerton, No. CV 07-239, 2008 WL 4239000, at *7 (D. Idaho Sept. 3, 2008) (unpublished) (defining "construction" as the "building of a new structure or the functional equivalent, such as additions and renovations, that substantially improve or modify a structure"); S. Utah Wilderness All. v. Bureau of Land Mgmt., 147 F. Supp. 2d 1130, 1139 (D. Utah 2001) (holding that "construction," through its ordinary meaning, requires some "form of purposeful, physical building or improving"); Myers v. Merrimack Mut. Fire Ins., 601 F. Supp. 620, 623 (C.D. Ill. 1985) (defining "construction" as "the building or erection of something which theretofore did not exist"), aff'd, 788 F.2d 468 (7th Cir. 1986). The United States urges the court to adopt the ordinary meaning of "construction." See [D.E. 20] 20–22.

JSmith responds that because EO 121 uses the term "construction" in a list after the phrase "Essential Infrastructure Operations," then the phrase "Essential Infrastructure Operations" informs what the term "construction" means in EO 121. See [D.E. 14] 18–19. At bottom, JSmith argues that including the term "construction" after the phrase "Essential Infrastructure Operations" requires the court to narrow the ordinary meaning of "construction." See id.

Generally, a court may find that "ambiguity exists when a [text] is capable of being understood by reasonably well-informed persons in two or more different senses." United States v. Selby, 333 F. Supp. 2d 367, 370 (D. Md. 2004) (cleaned up); see Robinson v. Shell Oil Co., 519

U.S. 337, 341 (1997); Universal Mar. Serv. Corp. v. Wright, 155 F.3d 311, 319–20 (4th Cir. 1998); United States v. Iron Mountain Mines, Inc., 812 F. Supp. 1528, 1557 (E.D. Cal. 1992). When determining the existence of ambiguity, the court must consider "not only the bare meaning of the word but also its placement and purpose in the" text. Bailey v. United States, 516 U.S. 137, 145 (1995); see Robinson, 519 U.S. at 341; United States v. Jennings, 323 F.3d 263, 266 (4th Cir. 2003); Universal Mar. Serv. Corp., 155 F.3d at 319–20.

The court must interpret the text of EO 121 as a whole. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."); King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991) ("[W]e do nothing more, of course, than follow the cardinal rule that a statute is to be read as a whole since the meaning of statutory language, plain or not, depends on context."); Biden v. Nebraska, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) ("To strip a word from its context is to strip that word of its meaning."). And in the context of EO 121, "construction" operates within a list of industries qualifying the scope of the phrase, "Essential Infrastructure Operations." See Exec. Ord. 121 § 2(C)(5). Thus, the court interprets the term "construction" in EO 121 in this context.

JSmith contends that because EO 121 includes the term "construction" in a list of "Essential Infrastructure Operations," EO 121 only exempts "construction businesses with respect to construction of essential infrastructure." [D.E. 14] 18–19; cf. Essential, Webster's II New Riverside University Dictionary (2d ed. 1988) (defining "essential" as "indispensable"); Essential, Black's Law Dictionary (12th ed. 2024) (defining "essential" as "[o]f the utmost importance; basic and necessary"). The court rejects JSmith's argument.

EO 121 exempts from closure "Essential Infrastructure Operations" and then explains that phrase with a list of operations that includes "construction." Notably, EO 121 states that "Essential Infrastructure Operations shall be construed broadly to avoid any impact to essential infrastructure, broadly defined." Exec. Ord. 121 § 2(C)(5). EO 121's express text thereby broadens the scope of the phrase "Essential Infrastructure Operations," and the term "construction," beyond JSmith's interpretation. Thus, EO 121 does not limit EO 121's exemption to construction of essential infrastructure.

As for EO 121's enumerated examples of "Essential Infrastructure Operations," EO 121 includes the term "construction" in the list of "Essential Infrastructure Operations," and that phrase can be "given more precise content by the neighboring words with which it is associated." United States v. Stevens, 559 U.S. 460, 474 (2010) (citation omitted); see Maracich v. Spears, 570 U.S. 48, 62–63 (2013); Exec. Ord. 121 § 2(C)(5). The list of "Essential Infrastructure Operations" also includes "landscaping" and "storage facilities." Exec. Ord. 121 § 2(C)(5). "Landscape" means "to adorn or improve [a section of ground] by contouring the land and planting flowers, shrubs, or trees." Landscape, Webster's II New Riverside University Dictionary (2d ed. 1988). "Storage" means "the act of storing goods." Storage, Webster's II New Riverside University Dictionary (2d ed. 1988). "Facilities" means "something created to serve a particular function." Facilities, Webster's II New Riverside University Dictionary (2d ed. 1988). Accordingly, "storage facilities" refers to business entities created for people to store goods.

"Storage facilities" and "landscaping" are not operations deemed essential or indispensable "in common parlance." Groff v. DeJoy, 600 U.S. 447, 468 (2023). Thus, a "reasonable reader, fully competent in the language" would not read EO 121's inclusion of "storage facilities" and "landscaping" in its exemptions and "underst[and] the text" to limit exemptions to only essential

or indispensable operations. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 33 (2012).

As for EO 121's specific examples of construction, EO 121 describes "construction" as "including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long term care facilities, public works construction, school construction, and essential commercial and housing construction." Exec. Ord. 121 § 2(C)(5). EO 121's use of the phrase "including, but not limited to" means that the list is not exhaustive. See, e.g., Google LLC v. Oracle Am., Inc., 593 U.S. 1, 18–19 (2021) (finding that a list was not exhaustive because "includes" preceded the list); United States v. Nixon, 130 F.4th 420, 431 (4th Cir. 2025) ("There is no indication . . . that this list is not exhaustive, as would be made clear by the inclusion of the phrase[] 'including but not limited to.'"). Thus, "construction" is not limited to the construction examples enumerated in EO 121.

EO 121's construction examples also do not suggest that "construction" is limited to only essential or indispensable infrastructure. When a list includes "a catchall phrase . . . . the catchall must be interpreted in light of its surrounding context and read to embrace only objects similar in nature to the specific examples." Harrington v. Purdue Pharma L.P., 603 U.S. 204, 217 (2024) (cleaned up). Accordingly, the types of construction qualifying for an exemption through EO 121's "including, but not limited to" informs the specific examples of construction in EO 121.

As for the specific examples of construction in EO 121, they are not limited to essential or indispensable infrastructure. See Exec. Ord. 121 § 2(C)(5). To illustrate this conclusion, examine the last construction example listed in EO 121: "essential commercial and housing construction." Id. (emphasis added). The other examples of construction in EO 121 lack the "essential" qualifier. See id. When "particular language [is included] in one section . . . but omit[ted] . . . from a

neighbor, [courts] normally understand that difference in language to convey a difference in meaning." Brittner v. United States, 598 U.S. 85, 94 (2023). The inclusion of "essential" before the "commercial and housing" construction example and the omission of "essential" before the other construction examples shows that the list is not limited to indispensable or essential infrastructure.

As used in EO 121, "construction" is not limited to indispensable or essential infrastructure, and the court declines to abandon the ordinary definition of "construction." The bankruptcy court properly construed EO 121, including the phrase "Essential Infrastructure Operations" and the term "construction." Thus, this court affirms the bankruptcy court's holding that JSmith was fully exempt from EO 121's mandatory shutdown because of its status as a construction company.

C.

As for the "Other Executive Orders" that JSmith listed in its submissions in the bankruptcy court, the bankruptcy court held that those other executive orders were not qualifying orders because JSmith "failed to show any evidence regarding how these orders required JSmith to suspend its operations." In re JSmith Civ., LLC, 674 B.R. at 216.[2] Notably, in seeking summary judgment, the United States argued that most of the executive orders mentioned in JSmith's complaint and depositions lifted mandates. Thus, the United States argued that such executive orders were not qualifying orders—i.e., government directives that compel a certain course of conduct through binding requirements or repercussions for noncompliance—under section 2301's suspension-by-order clause. See [D.E. 7-3] 17–18; CARES Act § 2301(c)(2)(A)(ii)(I). In the

---

[2] In its statement of material facts, JSmith lists Executive Order Nos. 116, 117, 121, 135, 138, 141, 147, 151, 155, 163, 169, 170, 176, 181, 188, 189, 195, and 204. See [D.E. 7-3] 475–79.

bankruptcy court, JSmith did not respond to the United States' argument or discuss any of these other Executive Orders. See [D.E. 7-3] 475–79, 489–95.

In the bankruptcy court and on appeal, JSmith failed to come forward with specific facts showing that these other Executive Orders qualified as orders under section 2301's suspension-by-order clause. See Matsushita Elec. Indus. Co., 475 U.S. at 587; Fed. R. Civ. P. 56(e). Thus, the court affirms the bankruptcy court's holding that these other Executive Orders are not qualifying orders.

D.

As for the NCDOL complaint about operating without proper COVID-19 protocols, the bankruptcy court concluded that the NCDOL complaint did not "qualify as an order under the ERC." In re JSmith Civ., LLC, 674 B.R. at 218. The bankruptcy court found that the NCDOL complaint "was based on a lack of proper protocols, not for operating a business that was not allowed to operate by a government order." Id. The NCDOL complaint was also not a compulsory command directing JSmith to fully or partially suspend its operations. See Order, Black's Law Dictionary (12th ed. 2024). Thus, the court affirms the bankruptcy court's holding that the NCDOL complaint is not an "order" under section 2301's suspension-by-order clause.

As for the CDC and OSHA policies, the bankruptcy court seemingly granted the United States summary judgment based on the bankruptcy court's finding that JSmith did not fully or partially suspend operations because of the policies. See In re JSmith Civ., LLC, 674 B.R. at 217. The bankruptcy court explained that the court "need not resolve" whether the CDC and OSHA policies were "a binding regulation" because "there has been no showing that . . . [JSmith] fully or partially suspended [its] operations." Id. Later in its order, the bankruptcy court stated that the CDC and OSHA policies did not "qualify as . . . governmental order[s]." Id. at 218.

In the bankruptcy court, the United States conceded that a genuine issue of material fact existed about whether JSmith experienced a partial suspension during Q2 2020 and Q2 2021. See [D.E. 7-3] 10–12; In re JSmith Civ., LLC, 674 B.R. at 214; cf. Clark v. Sweeney, 607 U.S. 7, 9–10 (2025) (per curiam). Thus, whether the bankruptcy court granted the United States summary judgment because the CDC and OSHA policies were not "orders" or based on the bankruptcy court's finding that JSmith did not fully or partially suspend its operations is material. Moreover, if the bankruptcy court granted the United States summary judgment because the CDC and OSHA policies were not "orders," the bankruptcy court did not explain that conclusion. See In re JSmith Civ., LLC, 674 B.R. at 217–18; cf. Lawrence Gen. Hosp., 90 F.4th at 605; Ne. Health Servs., LLC, 181 Fed. Cl. At 577; Baxter Senior Living, LLC, 2025 WL 1207151, at *6.

As for the USDOL policy, the bankruptcy court did not explain why it granted the United States summary judgment. See In re JSmith Civ., LLC, 674 B.R. at 217–18; cf. Lawrence Gen. Hosp., 90 F.4th at 605; Ne. Health Servs., LLC, 181 Fed. Cl. at 577; Baxter Senior Living, LLC, 2025 WL 1207151, at *6.

In a bankruptcy appeal, this court is a "court of review, not first view." Public Interest Legal Found., Inc. v. Wooten, 164 F.4th 362, 366 (4th Cir. 2026). Thus, the court vacates and remands to the bankruptcy court to explain why it granted the United States summary judgment as to the CDC, OSHA, and USDOL policies. See, e.g., Behrmann v. Nat'l Heritage Found., 663 F.3d 704, 709 (4th Cir. 2011); Leavers v. McLaughlin, 648 F. Supp. 3d 671, 676 (D. Md. 2023); In re Spangler, 56 B.R. 990, 991 (D. Md. 1986).

III.

In sum, the court AFFIRMS the bankruptcy court's interpretation of EO 121 § 2(C)(5) and related holding that appellant's Commercial Site Work Division was exempt from shutdown under EO § 2(C)(5), AFFIRMS the bankruptcy court's holding that the "Other Executive Orders" are not qualifying orders under section 2301's suspension-by-order clause, AFFIRMS the bankruptcy court's holding that the NCDOL complaint is not a qualifying order under section 2301's suspension-by-order clause, and VACATES and REMANDS for further proceedings about the CDC, OSHA, and USDOL policies.

SO ORDERED. This 30 day of September, 2026.

JAMES C. DEVER III
United States District Judge